ALFRED P. MacDONALD v. THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL

No. 36

(Filed 5 March 1980)

1. **State § 4— contract by State—implied consent to be sued—no sovereign immunity—prospective application**

     The decision of *Smith v. State*, 289 N.C. 303 (1976), which abrogated the doctrine of sovereign immunity for breach of contract, is to be applied only prospectively after 2 March 1976.

2. **State § 4.4; Colleges and Universities § 1— alleged breach of employment contract by UNC-CH—accrual of cause of action—application of sovereign immunity**

Plaintiff's cause of action against the University of North Carolina at Chapel Hill for breach of an employment contract accrued on 31 August 1974, the date upon which funds to pay his salary were exhausted and his employment was terminated, not on 6 June 1976 when William C. Friday, President of the University of North Carolina, sent a letter to plaintiff denying his grievance appeal. Therefore, the decision of *Smith v. State*, 289 N.C. 303, which is to be applied prospectively after 2 March 1976, did not apply to plaintiff's cause of action and it was barred by the doctrine of sovereign immunity.

APPEAL by defendant from *McKinnon, J.*, 7 May 1979 Session of ORANGE Superior Court. Plaintiff's petition for discretionary review pursuant to G.S. § 7A-31 prior to determination by the Court of Appeals was allowed 4 December 1979.

Stipulations and evidence presented at trial is summarized in pertinent part as follows:

The Frank Porter Graham Child Development Center (hereinafter designated as "the Center") was established in 1966 as an integral part of the University of North Carolina at Chapel Hill (hereinafter referred to as UNC-CH or defendant). Its purpose is to conduct scientific research in the area of child development, particularly in the area of learning disabilities, and to make that research available to persons working with handicapped children.

The primary means of support for most programs of the University is appropriations by the General Assembly. The Center, however, receives only 15 to 20 percent of its funds from appropriations by the state. Most of its funds come from grants and contracts with outside sources. Much of this funding, including the funds at issue in the present case, comes from the federal government. Financial support from such outside agencies is known as "soft money" because its continued flow rests not upon the customary state budgetary process but upon the determination of a particular outside agency to maintain the contract or grant.

The issues in the case at hand revolve around a "soft money" grant. The Disabilities Services and Facilities Construction Act of 1970 provided that planning and advisory councils were to be ap-

pointed in each of the fifty states. These councils were to develop plans and programs designed to improve and expand services to the handicapped. Because these councils were to be composed primarily of laymen, the Department of Health, Education and Welfare sought proposals from various institutions and organizations for the development of programs to provide these councils with technical assistance. In 1972, the Center submitted such a proposal. The proposal was subsequently accepted by HEW. The original term of this grant was two years and nine months, subject to annual renewal thereafter. Acceptance by the Center of the grant imposed the obligation of fulfilling the functions set forth in the grant proposal: providing technical service to the various disabilities councils. In order to assure that the technical service needs of the councils were met, the Center stated in its grant proposal that it would undertake a "needs assessment". This assessment was to be accomplished by a systematic survey of all the disabilities councils to ascertain those areas in which the council perceived a need of technical assistance.

Plaintiff was offered employment in the program funded by the HEW grant in a letter dated 6 October 1972 from Dr. James Gallagher, director of the Center. This letter read, in pertinent part:

"We would be pleased if you would accept a position as Research Associate, Associate Director of our new Technical Assistance Center (DD/RSA), and colleague. Recommended salary is $22,000 for the calendar year. The appointment is contingent upon the receipt and maintenance of funds."

Before the offer of employment was forwarded to plaintiff, he was interviewed by Dr. Gallagher and Dr. Donald J. Stedman, associate director of the Center. During the course of these interviews, they described the program which the grant funded and informed him that his potential role in the program was to be in the area of research utilization. In addition, the possibilities of other employment with the University, including joint appointments with other academic departments, were discussed. Plaintiff was subsequently interviewed by the faculty of the School of Education. In a letter dated 6 December 1972 from N. Ferebee Taylor, Chancellor of UNC-CH, plaintiff was offered an appointment in the School of Education. This letter read, in pertinent part:

"I am happy to inform you that our Board of Trustees has confirmed your appointment as Associate Professor, School of Education, beginning December 9, 1972, with salary of $22,000 contingent upon the availability of funds.

| | |
|---|---|
| Instructor | One year |
| Assistant Professor | Three years |
| Associate Professor | Five years |

Each of these is renewable if mutually satisfactory."

Plaintiff began work at the Center in October of 1972. He never taught any classes in the School of Education. His duties at the Center were twofold: (1) responsibility for his particular content area (in this case, research utilization); and (2) coordination of all program activities within a particular region.

In the fall of 1973, a survey of the planning and advisory councils indicated that only 1 percent of the persons responding to the inquiry had any interest in the area of research utilization. This finding was confirmed by the fact that only two of the 108 requests for assistance from the councils in the first two years of the program were for assistance in the area of research utilization. At about the same time of the survey, Dr. Ronald Wiegerink replaced Dr. Stedman as director of the program. Dr. Wiegerink observed that plaintiff needed only 25 percent of his work time to perform his functions under the program. The director suggested ways to plaintiff in which he could increase the interest of the councils in the functions he was charged with performing.

In early October 1973, Dr. Stedman met with plaintiff and advised him of the inability of the Center to continue funding his salary from the HEW grant because of the lack of interest of the councils in the area of research utilization. At that time, plaintiff was told that it would be necessary for him to generate alternative funding to pay his salary if he was to remain at the Center. To assist plaintiff in his efforts, Dr. Stedman indicated that plaintiff could spend up to 75 percent of his time seeking alternative funding. Plaintiff did not generate a proposal for alternative funding.

On 9 January 1974, Dr. Wiegerink circulated a memorandum stating his desire to dissolve the research utilization unit within the program as of the end of the next fiscal year. At approximate-

ly the same time, Dr. Gallagher requested the budget officer to review the availability of other funds within the Center to support plaintiff's salary. The budget officer indicated that the Center was running a deficit of between $30,000 and $60,000 and that there were no funds available which could be used to support plaintiff's position. Plaintiff was advised of the financial situation at the Center and was again urged to seek alternative funding for his position.

In preparing the annual request to HEW for continuation of the funding for the program, no funds were requested for the support of the research utilization unit. At trial, Dr. Wiegerink stated that continued support for research utilization was not sought because "very little work" in that area had been done and that the Center was unable to project any increase in the level of research in the time period covered by the renewal of the grant. The funding for the research utilization unit within the program lapsed as of 30 June 1974. The Center was able, however, to secure funding for plaintiff's position through 31 August 1974, at which time he was terminated.

Plaintiff undertook to follow established University grievance procedures. These procedures culminated in a letter from William C. Friday, President of the University of North Carolina, dated 6 June 1976 which denied plaintiff's appeal.

Plaintiff filed suit on 6 June 1977 in superior court against the University of North Carolina and UNC-CH as well as against numerous other named defendants, including President Friday and Chancellor Taylor. The suit sought recovery for (1) breach of contract, (2) wrongful interference with a contract, (3) wrongful discharge, and (4) conspiracy to wrongfully discharge.

Plaintiff stipulated to a dismissal with prejudice as to all defendants except UNC-CH. He also stipulated to a dismissal with prejudice as to claims 2 and 4. The court allowed defendant's motion to dismiss the wrongful discharge claim but specifically denied all motions to dismiss and for directed verdict on the ground of sovereign immunity.

The case was submitted to a jury on the claim for breach of contract. The jury found for plaintiff and awarded him damages in the amount of $43,000.00. Motions for judgment notwithstanding

the verdict and to set the verdict aside as being against the greater weight of the evidence were denied. Defendant UNC-CH appealed.

*Maxwell, Freeman, Beason & Lambe, P.A., by James B. Maxwell and Robert A. Beason, for plaintiff-appellee.*

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General Edwin M. Speas and Assistant Attorney General Elizabeth C. Bunting, for defendant-appellant.*

BRITT, Justice.

By its first assignment of error, defendant argues that the trial court erred in denying its motions to dismiss. Defendant contends that it is an agency of the State of North Carolina and thus enjoys the protection of sovereign immunity. The essence of its argument is that this court did not provide for retroactive application of the holding of the case of *Smith v. State*, 289 N.C. 303, 222 S.E. 2d 412 (1976), in which the doctrine of sovereign immunity for breach of contract was abrogated.

Prior to our decision in *Smith*, it had long been the rule in North Carolina that the doctrine of sovereign immunity prevented the state or one of its agencies from being sued without its consent. *E.g., Great American Ins. Co. v. Gold, Comm'r. of Ins.*, 254 N.C. 168, 118 S.E. 2d 792 (1961). Writing for the court in *Smith v. State*, Chief Justice Sharp held that ". . . whenever the State of North Carolina enters into a valid contract, the State implicitly consents to be sued for damages on the contract in the event it breaches the contract. Thus, in this case, and in causes of action on contract arising after the filing date of this opinion, 2 March 1976, the doctrine of sovereign immunity will not be a defense to the State. The State will occupy the same position as any other litigant." *Smith v. State*, 289 N.C. at 320.

The general rule is that decisions are presumed to operate retroactively. *Mason v. Nelson Cotton Co.*, 148 N.C. 492, 62 S.E. 625 (1908); *see generally State v. Rivens*, 299 N.C. 385, 261 S.E. 2d 867 (1980). It is proper to limit the application of a new rule of decision in a solely prospective manner only when there is a compelling reason for so doing. *State v. Rivens, supra; Mason v. Nelson Cotton Co., supra; Hill v. Brown*, 144 N.C. 117, 56 S.E. 693

(1907); *Hill v. Atlantic & N.C. R.R.*, 143 N.C. 539, 55 S.E. 854 (1906). When the law has received a given construction by a court of last resort, and contracts have been made and rights acquired under and in accord with such construction, such contracts may not be invalidated nor vested rights acquired under them impaired by a change of construction made by a subsequent decision. *Mason v. Nelson Cotton Co., supra; Hill v. Atlantic & N.C. R.R., supra.*

[1] The contract which gave rise to this litigation was entered into in 1972, at which time the doctrine of sovereign immunity was still a viable proposition of law. Consequently, the rights which had been acquired under the contract were subject to its mandate. Therefore, we reaffirm the conclusion of *Smith* in favor of a wholly prospective application of the abrogation of the doctrine of sovereign immunity.

[2] It is not enough that we reaffirm the wholly prospective application of *Smith*. If we are to complete our inquiry with regard to this assignment of error, we are compelled to consider the subsidiary question as to when plaintiff's cause of action accrued. Plaintiff contends that if this court should reaffirm the wholly prospective application of *Smith*, his cause of action nonetheless remains viable in that it did not accrue until President Friday denied his grievance in the letter of 6 June 1976. We disagree.

A cause of action does not accrue until a right which belongs to a person is invaded in some manner by another. *Thurston Motor Lines v. General Motors Corp.*, 258 N.C. 323, 128 S.E. 2d 413 (1962); *Shearin v. Lloyd*, 246 N.C. 363, 98 S.E. 2d 508 (1957). A cause of action for a suit involving a breach of contract accrues as of the date of breach. *See Reidsville v. Burton*, 269 N.C. 206, 152 S.E. 2d 147 (1967). Ordinarily, the time for performance must have expired, *Kelly v. Oliver*, 113 N.C. 442, 18 S.E. 698 (1893), but where an employee has been discharged by his employer, there is total breach for which only a single action lies. *See* 4 A. Corbin, *Contracts* § 958 (1951).

Plaintiff's employment at the Center terminated on 31 August 1974. It follows, therefore, that breach occurred, if at all, no later than that date, and plaintiff's cause of action accrued as of that date, some sixteen months before the decision in *Smith*. Counsel for plaintiff argues forcefully that the ultimate act con-

stituting breach of his contract of employment occurred after 2 March 1976 and was embodied in the letter of 6 June 1976 from President Friday denying the grievance appeal. However, the evidence is uncontroverted that plaintiff was no longer working at the Center in any capacity after 31 August 1974. In pursuing the internal review of his discharge, plaintiff was merely seeking administrative review of a decision which had already been made and implemented. In no way can it be concluded that the accrual of his cause of action was affected by this review. Plaintiff's rights were invaded, if at all, when he was dismissed from the Center on 31 August 1974, the date upon which funds to pay his salary were exhausted and after he was no longer able to act in any capacity at the Center.

At the time of oral argument, plaintiff directed this court's attention to the case of *In Re Metric Constructors*, 31 N.C. App. 88, 228 S.E. 2d 533 (1976), as additional authority for his position. Plaintiff's reliance on the case is inapposite. In *In Re Metric Constructors*, plaintiffs sought judicial review of an administrative decision of the Department of Administration which called for Metric Constructors, Inc., to forfeit a bid bond in the amount of $316,000.00. Metric had submitted a bid in the amount of $6,332,000 for construction of a state office building but later discovered that the bid failed to include an item of more than $896,000 for structural steel. Metric sought to withdraw its bid, but the Department of Administration awarded the contract to the firm anyway. Metric refused to perform the contract. The Department of Administration then held a hearing and denied Metric's request that the bond be released. Plaintiffs thereafter sought judicial review of the decision pursuant to Chapter 143, Article 33, of the General Statutes.

The superior court denied the Department's motion to dismiss, and defendant appealed, arguing that the suit was barred by the doctrine of sovereign immunity. The Court of Appeals affirmed, holding that when the General Assembly has expressly provided a means of judicial review for administrative decisions, the state has impliedly consented to waive the defense of sovereign immunity within the parameters of that review. *In Re Metric Constructors*, 31 N.C. App. at 91; *see generally, Great American Ins. Co. v. Gold, Comm'r. of Ins.*, 254 N.C. at 173, 118 S.E. 2d at 795. The Court of Appeals observed that the plaintiffs had

properly followed the procedures which had been mandated by the statutes for pursuing review of an administrative decision. *Id.*

In the present case plaintiff does not seek judicial review of an administrative decision at all. Instead, he has brought suit on four common law theories of recovery. Had plaintiff sought judicial review of the administrative decision of the University, he would have had to file a petition in Wake Superior Court no later than 30 days after having received a written copy of the final decision of the University. G.S. § 150A-45 (1978). No such review was sought. Instead, plaintiff filed an independent common law action approximately one year after President Friday's decision. In short, plaintiff elected to seek relief on a theory as to which the defense of sovereign immunity had not been waived or abrogated as of the date that his alleged cause of action had accrued. Therefore, he waived any judicial review like that sought by the plaintiffs in *In Re Metric Constructors, supra.*

The second paragraph of G.S. 150A-1(a) exempts the University of North Carolina and its constituent institutions from the provisions of Chapter 150A except for Article 4. Since plaintiff did not seek judicial review under Article 4, we find it unnecessary to determine the effect of the exempting provision on plaintiff's claim.

In light of our holding that the doctrine of sovereign immunity bars plaintiff's action, we decline to discuss the remaining assignments of error which defendant brought before the court.

Reversed.