902 F.2d 1134
 Barney K. HUANG, Plaintiff-Appellant,
v.
The BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA
and Its Constituent Institution, North Carolina
State University; Bruce R. Poulton;
F.J. Humenik, Defendants-Appellees.
 No. 88-1374.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 5, 1990.
Decided May 4, 1990.
As Amended May 8, 1990.
Rehearing and Rehearing In Banc Denied June 12, 1990.
 
 1
 Dean A. Shangler, Berman & Shangler, Durham, N.C., for plaintiff-appellant.
 
 
 2
 Thomas J. Ziko, Asst. Atty. Gen., Raleigh, N.C., for defendants-appellees.
 
 
 3
 Lacy H. Thornburg, Atty. Gen., Raleigh, N.C., on the brief, for defendants-appellees.
 
 
 4
 Before HALL and WILKINSON, Circuit Judges, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 
 ELLIS, District Judge:
 
 5
 Dr. Barney K. Huang, a tenured full professor at North Carolina State University ("NCSU"), was a member of the Department of Biological and Agricultural Engineering ("BAE") from 1963 until 1986. In 1986, he was involuntarily transferred from BAE to the Division of University Studies ("DUS") in the School of Humanities and Social Sciences. University Chancellor Bruce R. Poulton concluded the transfer was in the best interests of Dr. Huang and BAE. He reached this conclusion only after (i) requesting and receiving a report concerning Dr. Huang's performance and productivity in BAE; (ii) receiving a recommendation to terminate Dr. Huang from BAE's 21 full professors; (iii) engaging in substantial conciliation efforts with Dr. Huang; and (iv) providing Dr. Huang with an opportunity to present his grievances to the Faculty Mediation Committee, which, after a nine-day hearing, concluded that Dr. Huang's grievances were not substantiated and that the transfer was in the parties' best interests.
 
 
 6
 Aggrieved by the transfer, Dr. Huang filed suit pursuant to 42 U.S.C. Secs. 1981 and 1983, alleging that his rights to due process and free speech were violated by appellees'[1] conspiracy to transfer or dismiss him and that he was discriminated against in salary on the basis of his national origin (Chinese). In addition, Dr. Huang's suit included pendent state claims against appellees for intentional infliction of mental distress, defamation, and interference with contractual relations. The district court granted summary judgment for appellees on all claims except the Sec. 1981 salary discrimination claim and the claims against the acting head of BAE in his personal capacity.[2] Those claims were tried to a jury, which rendered verdicts in favor of appellees. Dr. Huang now appeals certain aspects of the district court's summary judgment rulings. Finding no reversible error in those rulings, we affirm.
 
 
 7
 * NCSU hired Dr. Huang as an assistant professor in 1963. In 1967, he received tenure, and in 1973 he was promoted to full professor. Throughout this period, and until 1986, he was a member of BAE. Sometime circa 1976, relations between Dr. Huang and BAE soured. In Dr. Huang's view, certain BAE members created obstacles to the discharge of his duties, attempted to block his merit raise and research funding, and generally sought to make his life difficult. BAE members saw matters differently. In their view, Dr. Huang's discharge of his professional duties was unsatisfactory in certain important respects. In January 1985, the situation had deteriorated to the point that Dr. Huang was involved in a physical confrontation with another BAE faculty member.
 
 
 8
 At about this time, Chancellor Poulton learned about the BAE faculty members' concerns regarding Dr. Huang's professional performance. As a result, the Chancellor requested and received a report from the Dean of the School of Agriculture and Life Sciences ("SALS") on the physical confrontation incident and Dr. Huang's performance and problems in BAE. The report recommended an outside, independent review of Dr. Huang's work. Dr. Huang rejected NCSU's proposal for such a review. Thereafter seventeen of the twenty-one BAE full professors met to consider the situation and, as a result, recommended to the SALS Dean "that procedures be initiated for the dismissal of [Dr. Huang] ... because of neglect of duty and improper conduct with departmental faculty, graduate students and staff." The four BAE full professors absent from the meeting later added their endorsements to this recommendation. Following receipt of this recommendation, Chancellor Poulton met first with the BAE professors and then with Dr. Huang. In the latter meeting, Dr. Huang suggested that his transfer to another NCSU department might resolve the matter. Seizing on this suggestion, the Chancellor sought an academic home for Dr. Huang in another NCSU department. When the success of this effort appeared in doubt, the Chancellor advised Dr. Huang that, unless he agreed to an independent review of his professional work, the Chancellor would be compelled to initiate his discharge. Dr. Huang at first agreed to, but ultimately rejected, the Chancellor's proposal. Further efforts to negotiate a mutually satisfactory solution failed.
 
 
 9
 Shortly thereafter, the Division of University Studies, a department devoted to interdisciplinary research and teaching, agreed to accept Dr. Huang. Chancellor Poulton, after determining that Dr. Huang's expertise in biological and agricultural engineering would be effectively employed in DUS, decided to transfer Dr. Huang to DUS. Dr. Huang, despite having initially suggested a transfer, resisted the Chancellor's decision. Chancellor Poulton then postponed the effective date of the transfer in order to grant Dr. Huang's request for an opportunity to present his grievances to the Faculty Mediation Committee, a faculty-elected standing committee designated to hear faculty grievances not involving discharges, suspensions or reductions in grade. The Committee heard Dr. Huang's case over a nine-day period involving approximately forty hours of testimony from eighteen witnesses. Dr. Huang appeared, was represented by counsel, and was permitted to present evidence and witnesses to support his grievances. The Committee also heard Chancellor Poulton, various NCSU administrators, and BAE members. After hearing all the witnesses and evidence, the Committee gave Dr. Huang and his counsel an opportunity to present closing arguments.
 
 
 10
 In the report it filed following the hearing, the Committee concluded that the evidence did not substantiate Dr. Huang's claims that NCSU officials had "obstruct[ed] his normal University duties and professional development, [and] ... [engaged in] unethical means to accomplish his dismissal or resignation." Beyond this, the Committee concluded that Dr. Huang's transfer from BAE was in the interests of Dr. Huang and the department. Consistent with this conclusion, the Committee proposed terms of transfer and recommended the appointment of a committee to explore negotiated resolutions. Chancellor Poulton accepted this recommendation, appointed a three-member negotiating committee, and charged it with negotiating a mutually agreeable resolution with Dr. Huang. This effort failed. Therefore, in September 1986, Chancellor Poulton transferred Dr. Huang to DUS.[3] Coincident with the transfer, NCSU reduced Dr. Huang's contractual obligation to the university from twelve months to nine months without a corresponding pay reduction.
 
 II
 
 11
 The district court dismissed Dr. Huang's monetary damage claims against the state defendants as barred by the Eleventh Amendment. As Dr. Huang correctly concedes, it is well settled that the Eleventh Amendment bars a suit by private parties to recover money damages from the state or its alter egos acting in their official capacities. See, e.g., Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). Dr. Huang also properly concedes that the Eleventh Amendment bars the pendent state monetary damage claims as well as the Sec. 1981 and Sec. 1983 damage claims. See Papasan v. Allain, 478 U.S. 265, 277, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986); Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106, 120-21, 104 S.Ct. 900, 911, 918-19, 79 L.Ed.2d 67 (1984); see also Actmedia, Inc. v. Stroh, 830 F.2d 957, 964 (9th Cir.1986) (Eleventh Amendment protection applies even where state officials alleged to have acted in excess of their authority). Seeking to avoid this result, Dr. Huang contends that North Carolina's enactment of N.C.Gen.Stat. Sec. 116-3 operates as a waiver of the state's Eleventh Amendment immunity.[4] The district court correctly ruled to the contrary.
 
 
 12
 While it is clear that a state may waive the Amendment's protection, it is equally clear that courts may find a waiver "only where stated 'by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.' " Edelman, 415 U.S. at 673, 94 S.Ct. at 1361 (quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)); see also Welch v. Texas Dept. of Highways & Pub. Transp., 483 U.S. 468, 473, 107 S.Ct. 2941, 2945-46, 97 L.Ed.2d 389 (1987); Pennhurst State School & Hosp., 465 U.S. at 99, 104 S.Ct. at 907. And it is settled that a statute waiving a state's sovereign immunity in its own courts is insufficient to waive its Eleventh Amendment immunity; the statute must specify the state's intention to be sued in federal court. See Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985).
 
 
 13
 N.C.Gen.Stat. Sec. 116-3 does not meet these rigorous standards. It contains no express language waiving North Carolina's constitutional immunity, nor does its language justify any inference of a waiver. Moreover, even if this provision could be construed as a waiver of North Carolina's sovereign immunity in its own courts, it lacks any indication that North Carolina has consented to suit in federal court. As the North Carolina Court of Appeals has noted, the provision, correctly construed, does no more than "allow UNC and its constituent institutions to sue and be sued in their own names but only as otherwise specifically provided by law." Truesdale v. University of North Carolina, 91 N.C.App. 186, 192, 371 S.E.2d 503, 507 (1988) (emphasis added), appeal and disc. rev. denied, 323 N.C. 706, 377 S.E.2d 229 (1989), cert. denied, --- U.S. ----, 110 S.Ct. 50, 107 L.Ed.2d 19 (1989).
 
 
 14
 Although no reported North Carolina decision squarely considers and decides that Sec. 116-3 does not waive Eleventh Amendment immunity, North Carolina law points unmistakably to that conclusion. The North Carolina Supreme Court in MacDonald v. University of North Carolina, 299 N.C. 457, 263 S.E.2d 578 (1980), implicitly rejected the related argument that Sec. 116-3 waives North Carolina's sovereign immunity in its own courts. That case, decided nine years after Sec. 116-3's passage, held sovereign immunity barred a professor's breach of employment contract case against UNC.[5] While MacDonald did not expressly consider Sec. 116-3, its holding makes clear that the nine-year-old provision did not waive the state's sovereign immunity. The North Carolina Court of Appeals subsequently made this conclusion explicit in Truesdale, noting that the General Assembly did not intend to abolish sovereign immunity for tort liability by passing Sec. 116-3. See 371 S.E.2d at 507; see also Corum v. University of North Carolina, 97 N.C.App. 527, 389 S.E.2d 596 (1990). Yet, if Sec. 116-3 is construed as Dr. Huang advocates, it would serve to waive all the state's immunity, including sovereign immunity. MacDonald and Truesdale preclude this result.
 
 
 15
 Accordingly, Sec. 116-3 does not waive North Carolina's sovereign immunity in its own courts, let alone its Eleventh Amendment immunity in federal court. Since North Carolina law nowhere specifically provides for waiver of Eleventh Amendment immunity, Sec. 116-3 is of no avail to Dr. Huang. Thus his money damage claims against appellees, as the district court correctly ruled, are barred.[6]
 
 III
 
 16
 In Count I, Dr. Huang asserts a Sec. 1983 claim based on his allegation that appellees violated his First Amendment rights by transferring him in retaliation for his "blowing the whistle" on an improper business arrangement between the BAE department head and a BAE member. The district court granted summary judgment on the ground that a transfer to another department did not deprive Dr. Huang of any constitutionally protected property interest, including any First Amendment interest. In this respect, the district court was mistaken, for Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), makes clear that possession of a property right is immaterial to a plaintiff's claim that he was deprived of some valuable benefit as a result of exercising his First Amendment rights. See id. at 597-98, 92 S.Ct. at 2697-98. Even so, the district court did not err in granting summary judgment for its decision "is not to be reversed if it has reached the correct result, even though the reason assigned by it may not be sustained." Stern v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 603 F.2d 1073, 1093 (4th Cir.1979); see also Beck v. Communications Workers of America, 800 F.2d 1280 (4th Cir.1986) (en banc), aff'd, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988). Here, settled principles confirm that the district court reached the right result.
 
 
 17
 Plaintiffs asserting First Amendment whistle-blower claims under Sec. 1983 must show first that the expressions which are alleged to have provoked the retaliatory action relate to matters of public concern.[7] See Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). Whether an expression involves a matter of public concern is a question of law. Id. at 148 n. 7, 103 S.Ct. at 1690 n. 7; Joyner v. Lancaster, 815 F.2d 20, 23 (4th Cir.), cert. denied, 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987). And it is settled that a public employee's expression of grievances concerning his own employment is not a matter of public concern. See, e.g., Connick, 461 U.S. at 148, 154, 103 S.Ct. at 1690, 1693; Piver v. Pender County Bd. of Ed., 835 F.2d 1076, 1080 (4th Cir.1987), cert. denied, 487 U.S. 1206, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988); Daniels v. Quinn, 801 F.2d 687, 690 (4th Cir.1986); Johnson v. Town of Elizabethtown, 800 F.2d 404, 406 (4th Cir.1986); Lewis v. Blackburn, 759 F.2d 1171 (4th Cir.1985) (en banc) (per curiam), adopting view of panel dissent per Ervin, J., 734 F.2d 1000, 1008 (4th Cir.1984), cert. denied, 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 228 (1985); Jurgensen v. Fairfax County, 745 F.2d 868, 879-80 (4th Cir.1984). Second, claimant must show that the alleged retaliatory action deprived him of some valuable benefit. Perry, 408 U.S. at 597, 92 S.Ct. at 2697. Third, claimant must show a causal relation between the expression of public concern and the retaliatory action. The causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that "but for" the protected expression the employer would not have taken the alleged retaliatory action. See Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); Jurgensen, 745 F.2d at 878; Johnson, 800 F.2d at 406.
 
 
 18
 In the context of this case, therefore, Dr. Huang can survive summary judgment only if the record reflects that he made a statement on a matter of public concern, that this expression was the "but for" cause of his transfer, and that the transfer from BAE to DUS deprived him of a valuable benefit. It is the causation requirement on which Dr. Huang's claim most clearly fails. Dr. Huang alleged that in 1980, some six years prior to his transfer, he "blew the whistle" about an improper business arrangement between two BAE members involving state funds. Appellees do not seriously contest that such an accusation relates to a matter of public concern. They contend, however, that the record facts do not support the allegation that Dr. Huang made any statements or accusations concerning the misuse of public funds. Even assuming, arguendo, that Dr. Huang made the disputed statements and that they related to a matter of public concern, it remains pellucidly clear that the record presents no triable issue as to causation. According to the record, Chancellor Poulton did not become involved until 1985, following Dr. Huang's physical altercation with another BAE member. Even then, he did not make a final decision to transfer Dr. Huang until, some twenty months later, he had completed a thorough review of the matter and assembled a substantial record. Included in this record were (i) the report of the SALS Dean detailing the numerous conflicts and problems concerning Dr. Huang's professional performance in BAE, (ii) the unanimous BAE senior faculty recommendation calling for Dr. Huang's discharge on professional performance grounds, and (iii) the Faculty Mediation Committee's report and unanimous conclusion that a transfer would be in the best interests of Dr. Huang and the university. There is not a scintilla of evidence that the Chancellor's decision was infected with a retaliatory motive traceable to the alleged 1980 whistle-blowing incident. A jury could not reasonably have found the requisite "but for" causation. In these circumstances, summary judgment was plainly appropriate. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).
 
 IV
 
 19
 The district court correctly rejected Dr. Huang's procedural and substantive due process claims. To have a property interest subject to procedural due process protection, an individual must be entitled to a benefit created and defined by a source independent of the Constitution, such as state law. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); Bradley v. Colonial Mental Health & Retardation Servs. Bd., 856 F.2d 703, 707 (4th Cir.1988). Here, Dr. Huang's position as a tenured professor is indisputably a property right entitled to procedural due process protection. Also beyond dispute is that there is no evidence that he has been deprived of this right. He remains a tenured full professor in the University at the same or effectively greater salary. Moreover, Dr. Huang received all the process he was due and more. He had ample opportunity to meet with Chancellor Poulton and other administrators in connection with NCSU's mediation efforts. He also had ample opportunity to air his grievances and claims in a nine-day hearing before an impartial Faculty Mediation Committee. His contention that the hearing was conducted under the wrong University code provision is baseless. Section 603, the provision invoked by Dr. Huang, applies only in cases of dismissal, demotion in rank, or serious sanction. No evidence supports the claim that the transfer fits any of these categories. In any event, the process accorded Dr. Huang met even the standard he suggests, as it ensured that the decision to transfer him was not arbitrary and that it "was reached in a fair and impartial manner ... after careful and deliberate consideration and that the process was not so lacking in reasonableness that notions of fairness are offended." Brief of Appellant, p. 30; see Regents of the University of Michigan v. Ewing, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985). Dr. Huang's procedural due process claim, therefore, fails.
 
 
 20
 Dr. Huang contends, however, that he had a property right in his BAE position. This argument is unpersuasive. As this Circuit has previously noted:
 
 
 21
 [N]o authority ... supports the proposition that a property interest in the continued expectation of public employment includes the right to physically possess a job, in defiance of the stated desire of the employer.... Indeed, to hold that [an employee] had a constitutionally protected property interest in continuing to perform his services would make it impossible for a public employer, dissatisfied with an employee's performance, but without specific contractual cause to discharge him, to relieve the employee from his duties although willing to compensate the employee in full....
 
 
 22
 We are convinced that any constitutionally protected property interest [an employee has] as a result of his employment contract [is] satisfied by payment of the full compensation due under the contract.
 
 
 23
 Royster v. Board of Trustees, 774 F.2d 618, 621 (4th Cir.), cert. denied, 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1985). As Dr. Huang remains more than fully compensated in his DUS position, we are unable to conclude that the inter-departmental transfer resulted in an infringement of a constitutionally protected property interest.
 
 
 24
 We agree, therefore, with the Eleventh Circuit, which sensibly concluded that the transfer of tenured professors from one department to another, without loss of rank or pay, does not implicate any property interest protected by the Due Process Clause. See Maples v. Martin, 858 F.2d 1546, 1550-51 (11th Cir.1988).[8] And this position is also consistent with that of the Fifth and Sixth Circuits, which have held that certain intra-departmental demotions do not implicate property interests subject to procedural due process protection. See Garvie v. Jackson, 845 F.2d 647, 651 (6th Cir.1988) (demotion from department chairman to professor not a denial of a protected property interest); Kelleher v. Flawn, 761 F.2d 1079, 1087 (5th Cir.1985) (reduction of graduate student's teaching duties is not denial of a protected property interest).
 
 
 25
 Beyond this, Dr. Huang also urges that his transfer violated his substantive due process right to continued employment in BAE free from arbitrary state action.[9] Even assuming, arguendo, that Dr. Huang's position as a BAE professor is a right subject to substantive review under the Due Process Clause,[10] this claim fails. As the Supreme Court noted:
 
 
 26
 When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.
 
 
 27
 Regents of the University of Michigan v. Ewing, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985). And evidence that a decision was unwise or mistaken cannot establish a substantive due process claim. See Bishop v. Wood, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976) ("the Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions"). Here, it is plain that a reasonable jury could not find that University officials failed to exercise their professional judgment or ventured "beyond the pale of reasoned academic decision-making." Ewing, 474 U.S. 214, 227-28, 106 S.Ct. 507, 514-15, 88 L.Ed.2d 523 (1985). Thus, the district court correctly granted summary judgment on the substantive due process claim.
 
 V
 
 28
 Finally, Dr. Huang claims that the district court abused its discretion when it refused to permit defense counsel to withdraw on the morning of trial. This claim is baseless. Defense counsel moved for leave to withdraw out of concern that a witness had made misrepresentations in an affidavit. Such a motion, as the parties agree, lies within the sound discretion of the trial judge. See Ohntrup v. Firearms Center, Inc., 802 F.2d 676, 679 (3rd Cir.1986); Andrews v. Bechtel Power Corp., 780 F.2d 124, 135 (1st Cir.1985), cert. denied, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986); Washington v. Sherwin Real Estate, Inc., 694 F.2d 1081, 1087 (7th Cir.1982). Significantly, Dr. Huang vigorously opposed his counsel's motion. This, in itself, is sufficient to support the trial judge's decision to deny the motion to withdraw. A party cannot have it both ways; he may not vigorously oppose his counsel's motion to withdraw and then later, when he is dissatisfied with the result of a trial, claim that the trial court abused its discretion by ruling as he requested. See Washington, 694 F.2d at 1088 (abuse of discretion unlikely where client acquiesced in decision to permit counsel to withdraw); Thonen v. Jenkins, 455 F.2d 977 (4th Cir.1972) (a party cannot appeal from an order entered with his consent unless he establishes facts to nullify the consent). Thus the district court did not abuse its discretion when it agreed with Dr. Huang and denied his counsel's eleventh hour withdrawal motion.
 
 VI
 
 29
 For all the reasons stated herein, the district court's grant of summary judgment is
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 Named as defendants and referred to here collectively as "appellees" are NCSU, the governing board of NCSU, the Board of Governors of the University of North Carolina, NCSU Chancellor Poulton and Frank J. Humenik, acting BAE chairman
 
 
 [2]
 The district court concluded that triable fact issues existed with respect to the qualified immunity defense asserted by the acting BAE head. See Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)
 
 
 [3]
 Such involuntary transfers were not unprecedented at NCSU. The record reflects that since 1970, nineteen faculty members were involuntarily transferred to other NCSU departments
 
 
 [4]
 North Carolina General Statute Sec. 116-3 provides in pertinent part:
 The Board of Governors of the University of North Carolina shall be known and distinguished by the name of "the University of North Carolina" and shall continue as a body politic and corporate and by that name shall have perpetual succession and a common seal.... The corporation ... shall be able and capable in law to sue and be sued in all courts whatsoever; and ... in general may do all such things as are usually done by bodies corporate and politic, or such as may be necessary for the promotion of learning and virtue.
 
 
 [5]
 It is important to note, however, that at the time MacDonald was decided, the doctrine of sovereign immunity had already been abrogated in North Carolina for breach of contract actions against the state. In Smith v. State, 289 N.C. 303, 222 S.E.2d 412 (1976), the North Carolina Supreme Court held that, by entering into a valid contract, the state implicitly consents to be sued for damages that arise from a subsequent breach. Id., 222 S.E.2d at 425-26. MacDonald did not overturn Smith. Rather, in a narrow holding, it merely held that the decision in Smith would be given prospective effect only. As the MacDonald plaintiff's cause of action had accrued before the decision in Smith, his suit was barred. Smith has no application here; the narrow waiver of immunity authorized there is no authority for the broad waiver of the Eleventh Amendment sought here
 
 
 [6]
 An alternative and potentially dispositive basis for denial of the Sec. 1983 claims against NCSU, the NCSU governing board, the Board of Governors of the University of North Carolina, and the individual defendants in their official capacities is that, as alter egos of the state, they are not "persons" within the meaning of Sec. 1983. See Will v. Michigan Dept. of State Police, --- U.S. ----, 109 S.Ct. 2304, 2311-12, 105 L.Ed.2d 45 (1989). Because this ground was not advanced or argued by the parties, the Court does not here rely on it
 
 
 [7]
 If the expressions relate to a matter of public concern, First Amendment protection attaches only if the employee's interest in the speech outweighs the employer's interest in "effective and efficient fulfillment of its responsibilities to the public." Connick, 461 U.S. at 150, 103 S.Ct. at 1692; see also Johnson v. Town of Elizabethtown, 800 F.2d 404, 406 (4th Cir.1986)
 
 
 [8]
 The Seventh and Tenth Circuits have reached essentially the same result outside the university context. See Volk v. Coler, 845 F.2d 1422, 1430 (7th Cir.1988) (no property interest in employment in a particular state welfare agency office); Childers v. Independent School District No. 1, 676 F.2d 1338, 1341 (10th Cir.1982) (tenured secondary school teacher has no property interest in particular teaching assignment)
 
 
 [9]
 Since Dr. Huang remains employed by NCSU, his only possible substantive due process claim must pertain to his transfer from BAE to DUS
 
 
 [10]
 It is doubtful that Dr. Huang's position in BAE is a right properly subject to substantive due process review. Unlike rights subject to procedural due process protection, which arise from sources other than the Constitution, substantive due process rights arise solely from the Constitution. Dr. Huang's entitlement to a position in BAE, if it exists, is essentially a state law contract right, not a fundamental interest embodied in the Constitution. See Ewing, 474 U.S. at 229-30, 106 S.Ct. at 515-16 (Powell, J., concurring)