**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

STEVEN GOAD, M.D.,
Plaintiff-Appellant,

v.

JOEL SILVERMAN, M.D., in his
individual capacity as committee
member and as Chairman for the
Department of Psychiatry at the
Medical College of Virginia;
ROCHELLE KLINGER, M.D., in her
individual capacity as a committee
member and as the PYG-4
Coordinator for the Department of
Psychiatry at the Medical College

of Virginia; JOHN URBACH, M.D., in                No. 96-2597
his individual capacity as committee
member and as Residency
Education Director for the
Department of Psychiatry at the
Medical College of Virginia; JAMES
LEVINSEN, M.D., in his individual
capacity as committee member and
Chairman of the Consult and
Liaison Division for the Department
of Psychiatry at the Medical
College of Virginia; ROBERT COHEN,
M.D., in his individual capacity as

committee member and as Vice-Chair for the Department of Psychiatry at the Medical College of Virginia; ROBERT PERRY, M.D., in his individual capacity as Associate Dean of Graduate Medical Education at the Medical College of Virginia; HERMES KONTOS, M.D., in his individual capacity as Dean of the School of Medicine at the Medical College of Virginia; MEDICAL COLLEGE OF VIRGINIA, Commonwealth of Virginia; KAREN SANDERS, in her individual capacity as a committee member at the Medical College of Virginia; KATHLEEN SCOTT, in her individual capacity as a committee member at the Medical College of Virginia; DAVID WILKINSON, in his individual capacity as a committee member at the Medical College of Virginia, Defendants-Appellees,

and

SNOWDEN HOLDING COMPANY, d/b/a Snowden at Fredericksburg; PSYCHIATRIC ASSOCIATES OF FREDERICKSBURG, INCORPORATED; ROBERT NICCOLINI, M.D., Defendants.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert R. Merhige, Jr., Senior District Judge. (CA-96-297-R)

2

Argued: July 17, 1997

Decided: September 5, 1997

Before MURNAGHAN, Circuit Judge, and BUTZNER and
PHILLIPS, Senior Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Thomas Hunt Roberts, THOMAS H. ROBERTS &
ASSOCIATES, P.C., Richmond, Virginia, for Appellant. Pamela Fin-
ley Boston, Special Assistant Attorney General, Office of the Attor-
ney General, VIRGINIA COMMONWEALTH UNIVERSITY,
Richmond, Virginia, for Appellees. **ON BRIEF:** James S. Gilmore,
III, Attorney General of Virginia, David L. Ross, Special Assistant
Attorney General, OFFICE OF THE ATTORNEY GENERAL, Rich-
mond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

On May 18, 1995, the Medical College of Virginia dismissed Dr.
Steven Goad from its psychiatry residency program. Dr. Goad filed
suit against the Medical College of Virginia alleging a variety of legal
challenges to his dismissal. The district court granted the defendants'
Rule 12(b)(6) and summary judgment with respect to some counts.
Thereafter the case proceeded to trial. Upon completion of Dr. Goad's

3

case, the defendants made a motion under Federal Rule of Civil Procedure 50(a) on the remaining counts. The district court granted the motion. Dr. Goad now appeals. For the reasons that follow, we affirm the district court.

I.

FACTS AND PROCEDURAL HISTORY

In June, 1991, Steven Goad began his psychiatry residency at the Medical College of Virginia of the Virginia Commonwealth University (MCV). Dr. Goad sought to refine his skills by critically examining both the "Christian psychiatry" and the"cross-cultural psychiatry" approaches. MCV's emphasis on cross-cultural psychiatry provided a great draw for Dr. Goad.

Dr. Goad, however, found the focus of the cross-cultural psychiatry directed by Drs. Joel Silverman, Steven Urbach, and Rochelle Klinger, to be much broader than he expected. In his view, Dr. Goad, a born-again Christian, found that the curriculum espoused the view that the gay and lesbian community represented a culture equally important with traditionally recognized cultures, such as the Japanese culture. Dr. Goad surmised this emphasis was a result of Dr. Klinger, a self-professed lesbian.

During the course of his studies, Dr. Goad frequently discussed his religious views. These discussions often took place in seminars conducted by Dr. Klinger, in which Dr. Goad would express his views about homosexuality and religion. Although Dr. Goad wanted Dr. Klinger to supervise Dr. Goad's residency, according to Dr. Goad, Dr. Klinger refused to work with him due to his fundamentalist Christianity.

As Dr. Goad worked through his residency, in February 1993, a female medical student filed a complaint against him. According to the student's complaint, in November 1992, while Dr. Goad was the "first-on-call" resident sharing an "on-call" room with the female student, Dr. Goad made unwanted advances toward the female student. Specifically, Dr. Goad offered to give the student a back rub. After

4

the student declined his offer, Dr. Goad apologized. Dr. Goad also apologized the next day.

The student filed her complaint with Dr. James L. Levenson, Professor and Chair, Division of Consultation/Liaison Psychiatry, who in turn relayed the student's complaint to Dr. John R. Urbach, Associate Professor of Psychiatry and Residency Program Director. Thereafter, both faculty members met with Dr. Goad to discuss the complaint and to advise him of the potential professional consequences of engaging in inappropriate conduct with female students. At that time, Drs. Levenson and Urbach gave Dr. Goad a copy of the VCU Sexual Harassment Policy. The student involved in the incident declined to pursue the matter further. Meanwhile, on April 5, 1994, the Residency Education Training Committee (RETC) promoted Dr. Goad to chief resident over Dr. Klinger's objections.

In May 1994, Dr. Urbach received an anonymous letter stating that Dr. Goad had been making unwanted advances to a female student despite the student's expressed desire that Dr. Goad leave her alone. On May 16, 1994, Dr. Goad met with Dr. Urbach to discuss the letter. Dr. Goad acknowledged that he had been involved in an extra-marital affair with the student who was the subject of the anonymous letter. Dr. Goad also stated that he had difficulty after he and the female student broke up and that he made repeated attempts to reach the student and make amends through apologies. Again, Dr. Goad was advised of his need to respect professional boundaries and to avoid behavior that could be interpreted as unwanted overtures.

In June 1994, Dr. Hugo Siebel, Associate Dean of Student Affairs for the School of Medicine confirmed in writing to Dr. Joel J. Silverman, Chairman of the Department of Psychiatry, that two medical students had come forward asking to speak with Dr. Siebel about Dr. Goad. One student reported a "spiritual counseling" relationship she shared with Dr. Goad in which Dr. Goad unexpectedly shifted the relationship into a potentially sexual situation. The other student made a complaint about Goad's unwanted physical advances in a call-room setting. Neither student, however, chose to file formal charges of sexual harassment against Dr. Goad.

Drs. Urbach and Silverman met with Dr. Goad in July 1994 to discuss the latest complaints. As a result of the meeting, the Department

5

of Psychiatry decided to take the following actions: (1) to suspend Goad from the Residency Program on July 14, 1994 and (2) to require Goad to participate in a psychological evaluation, to which Goad agreed. In addition, at the meeting, Drs. Urbach and Silverman informed Dr. Goad of his right to seek legal counsel and the availability of numerous university resources. Dr. Goad declined to pursue either of these options.

Following Dr. Goad's psychological assessment,[1] the Department of Psychiatry Committee (Department Committee)[2] placed Dr. Goad on probation for the remainder of his residency. As a condition of his probation, the Department Committee directed Dr. Goad to avoid any further interactions which could be perceived as inappropriate advances towards medical students or other medical center or university personnel. The Committee told Dr. Goad that a violation of his probation could result in his dismissal from the residency program.

Dr. Goad progressed through the program without incident. In April 1995, however, Dr. Silverman received a call from Dr. Robert Niccolini, Medical Director of Snowden at Fredericksburg, a psychi-

_____

[1] In pertinent part, the assessment report stated:

> Dr. Goad acknowledges sexual attraction to the students and acknowledges varying degrees of inappropriate conduct or conduct which could be misinterpreted .... He attributes these `boundary problems' to sexual dissatisfaction in his marriage and to frustration that his sexual prohibitions have been so strict while others have more lenient rules .... [Dr. Goad] accepts responsibility for inappropriate behavior in most of the incidents but points out that students were willing participants .... He likens his behavior over the past two years to his addictive behavior in college when he `got off track' and his relationship with God was distant ... There is reason to suspect that[Goad's] ability to perform as a physician and particularly as a psychotherapist will continue to be compromised if the boundary issues and their origins are not addressed.

[2] In addition to Dr. Silverman, the Committee included Dr. Urbach; Dr. Levenson, Rochelle L. Klinger, Associate Professor and PGY-4 Residency Coordinator; and Robert Cohen, Professor and Director, Virginia Treatment Center for Children.

atric facility in Fredericksburg, Virginia.**3** Dr. Niccolini informed Dr. Silverman that a staff social worker had complained about Dr. Goad's behavior during Dr. Goad's first "moonlighting" assignment at Snowden. Dr. Niccolini relayed to Dr. Silverman the staff social worker's sentiment that she felt "harassed and uncomfortable" with Dr. Goad's behavior.

As a result of Dr. Niccolini's telephone call, on May 4, 1995, Dr. Silverman met with Dr. Goad. During the meeting Dr. Goad admitted that he had a conversation with the social worker at Snowden, but stated that the conversation centered on the relationship between Dr. Goad's Christian view of an actual relationship with God contrasted with Freud's view of merely a belief in God. According to Dr. Silverman's contemporaneous notes taken during the session, in response to Dr. Silverman's statement that the social worker was significantly disturbed by the conversation, Dr. Goad responded"I wanted her. I recognized I was on the same course I was on in the past but I couldn't stop." At the close of the meeting, Dr. Silverman informed Dr. Goad that a faculty committee would meet to discuss Goad's completion of the residency program.

On May 16, 1995, upon Dr. Goad's request, he met with Dr. Silverman. Dr. Goad began the meeting by apologizing for the Snowden incident. Dr. Goad also stated that "[h]e saw his sexual behavior as a cancer destroying him" and that "God is using [Silverman] like a [leash]**4** to make [Goad] face the reality of his evil and badness." On May 18, 1995, the Department Committee, previously established to assess and to monitor Dr. Goad's performance during his probationary year, was reconvened. The Committee recommended that Dr. Goad be dismissed immediately from the residency program.

Later that day, Drs. Urbach and Silverman met with Dr. Goad. The doctors invited Dr. Goad to present any new information relevant to the recent events. Dr. Goad stated that he had informed his family and sought their support. Thereafter, Drs. Urbach and Silverman informed

_____

**3** The VCU Department of Psychiatry had an academic "moonlighting" affiliation with Snowden.
**4** Dr. Silverman's notes used the term "chokehold" but Dr. Goad says he used the word leash.

7

Dr. Goad of the Committee's decision to dismiss him from the residency program and, as a consequence, Dr. Goad would not graduate. Drs. Urbach and Silverman told Dr. Goad that he had a right to appeal and the appeal procedures were outlined in the MCV Housestaff Manual.

Dr. Goad appealed the Department Committee's decision. On June 30, 1995, a hearing was held on Dr. Goad's appeal. The hearing lasted four hours and Dr. Goad called four witnesses on his behalf. Following the hearing, the Committee issued a decision upholding Dr. Goad's dismissal from the program. Dr. Goad appealed the decision to Dr. Robert P. Perry, Associate Dean for Graduate Medical Education. On August 3, 1995, the Department Committee forwarded a letter to Dr. Perry explaining its decision. Dr. Perry concluded that the Committee's decision lacked sufficient support and recommended the matter be returned to the Committee for further consideration and fact-finding.

In response to Dr. Perry's concerns, the Committee held another meeting and invited Dr. Niccolini to appear. Neither Dr. Goad nor his attorneys were present during Dr. Niccolini's testimony, so the Committee audiotaped his testimony. A copy of the audiocassette was provided to Dr. Goad and Dr. Goad provided a written response to Dr. Niccolini's testimony. No other evidence was offered.

On September 20, 1995, the Department Committee forwarded a second decision to Dr. Perry. Upon further review, Dr. Perry found that the record supported the Committtee's decision and that dismissal was an appropriate sanction. In response to Dr. Perry's decision, Goad appealed to Dr. Hermes A. Kontos, Dean of the School of Medicine.

Dr. Kontos, as required by the Housestaff Manual, appointed a second committee to review and to hear Dr. Goad's case. The second committee members included Dr. Karen M. Sanders, Dr. Kathleen J. Scott, and Dr. David S. Wilkinson -- non-members of the Department of Psychiatry. On November 15, 1995, the second committee held a hearing at which Dr. Goad testified but did not present any witnesses. After obtaining a statement from the Snowden social worker,[5]

_____

[5] The second committee gave Dr. Goad an opportunity to respond to the statement, but he declined to do so.

8

the second committee voted unanimously to sustain the dismissal decision. Thereafter, Dr. Kontos reviewed all the recommendations made during the course of Goad's appeal. On January 6, 1996, Dr. Kontos sent Dr. Goad a letter dismissing him from the psychiatry residency program.

On April 8, 1996, Dr. Goad filed suit in the United States District Court for the Eastern District of Virginia alleging that his termination from the residency program at MCV violated his First, Fourth, and Fourteenth Amendment rights. In addition, the complaint alleged state law claims for defamation, conspiracy to injure, and wrongful termination. On May 6, 1996, the defendants filed a motion to dismiss, and on May 24, the defendants filed a motion for summary judgment. On June 14, 1996, Dr. Goad filed a motion for summary judgment on all his claims.

On August 6, 1996, the district court granted the defendants' motion to dismiss and dismissed MCV, the Commonwealth of Virginia, and the MCV defendants sued in their official capacities; dismissed Counts IV (federal conspiracy), V (defamation), VI (breach of contract), and VII (state conspiracy) for failure to state a claim; dismissed defendants Robert Niccolini, M.D., Snowden Holding Company and Psychiatric Associates of Fredericksburg, Inc. from the lawsuit, and granted the defendants' motion for summary judgment as to Count III (due process); denied the defendants' motion to dismiss with respect to Counts I, II, and VIII, as against the MCV defendants in their individual capacities, and denied Dr. Goad's motion for summary judgment. On September 19, 1996, after argument on the defendants' motions for summary judgment on the remaining counts and clarification of court's order with respect to Count III, the district court amended its Order and dismissed Count III altogether, but denied the defendants' motion for summary judgment. On September 30 and October 1, 1996, the case proceeded to trial on the remaining claims. On October 1, 1996, at the conclusion of the Dr. Goad's case, the district court granted the defendants' Rule 50 motion. Thereafter, the district court dismissed Counts I (speech), Count II (religion) and VIII (state claim for wrongful termination). The instant appeal followed.

9

II.

DISCUSSION

In the instant appeal, Dr. Goad has raised a number of issues on appeal. Despite the multiplicity of issues, at oral argument the parties focused primarily on the district court's grant of the defendants' Rule 50(a) motion with respect to Dr. Goad's First Amendment claims. A district court may grant a motion for judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue ...." Fed. R. Civ. P. 50(a); Redman v. John D. Brush and Co., 111 F.3d 1174, 1177 (4th Cir. 1997). In employing this standard, the district court is required to view the evidence in a light most favorable to the non-moving party. Our review of the district court's grant of the defendants' Rule 50(a) and summary judgment motion is de novo. See Redman, 111 F.3d at 1177. We now address the district court's grant of the defendants' Rule 50(a) motion.

First Amendment Claims

Dr. Goad claims the district court erred in granting the defendants' Rule 50(a) motion with respect to his freedom of religion, freedom of speech, and state law wrongful termination claims. Dr. Goad contends that he was terminated impermissibly from the residency program based on his First Amendment rights of freedom of speech and religion. We now address each contention in seriatim .

A. Freedom of Speech

Dr. Goad must satisfy the following three elements to establish a First Amendment retaliation claim: first, Dr. Goad must show that his speech related to matters of public concern; second, Dr. Goad must show that the alleged retaliatory action deprived him of some valuable benefit; and third, Dr. Goad must demonstrate a causal relationship between his speech relating to a matter of public concern and the retaliatory action. See Huang v. Board of Governors, 902 F.2d 1134 (4th Cir. 1990). This Court has stressed that the causation requirement is "rigorous." Id. at 1140. Goad must not only demonstrate that his

10

protected speech "played a role or was a motivating factor in the retaliation; [Goad] must show that `but for' the protected expression the employer would not have taken the alleged retaliatory action." Id.

Here, Dr. Goad claims that the retaliation by the MCV officials as a result of his speech was demonstrated on three separate occasions. First, Dr. Goad claims the timing of his termination from the residency program -- five weeks before completion and after the Snowden incident in which he discussed religion and sex with a staff social worker -- shows the retaliation on the part of MCV. Second, Dr. Goad claims his previously expressed views about the "unhealthy consequences" of homosexual/lesbian behaviors to Dr. Klinger, a lesbian, show the retaliation because Dr. Klinger refused to serve as his supervisor. Third, Dr. Goad claims he was treated differently from others who also had relationships with the medical students due to his religious views. An application of the factors established in Huang requires a rejection of Dr. Goad's claim, specifically the third factor -- causation. Assuming arguendo that Dr. Goad could satisfy the first two elements,[6] Dr. Goad's claim fails to satisfy the causation factor.[7]

_____

[6] Dr. Goad's satisfaction of the first factor is questionable given that the speech he claims was protected appears to be his conversations with Dr. Klinger in 1993 during Dr. Klinger's seminar on multiculturalism. The record does not bear out that any of Dr. Goad's conversations with Dr. Klinger addressed matters of public concern.

With respect to the second element, if Dr. Goad's speech with Dr. Klinger is protected, Dr. Goad must demonstrate that alleged retaliatory action deprived him of some benefit. Dr. Goad appears to claim that Dr. Klinger's supervision of him is that benefit of which he was deprived. As the district court noted, Dr. Goad does not have a "right" to have Dr. Klinger supervise him. Dr. Klinger was not the only supervisor available, and Dr. Goad did receive supervision.

[7] In Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977), the Supreme Court addressed the issue of causation in the First Amendment context involving constitutionally protected speech. In Mt. Healthy, the plaintiff, a non-tenured teacher, sued the Board of Education claiming that the Board's decision not to renew his contract violated his First and Fourteenth Amendment rights. Among his claims, the plaintiff claimed that the Board's refusal to renew his contract was a result of a telephone call that the plaintiff had placed to a local radio station. Id. at

11

Dr. Goad must demonstrate that <u>but for</u> his protected speech he would not have been terminated, allegedly in retaliation, from the program. The evidence in the record overwhelmingly shows that Dr. Goad was terminated as a result of his repeated inappropriate contact with medical students and a female staff worker at Snowden. In fact, Dr. Goad's own testimony reveals that he admitted to the past incidents and demonstrated remorse.

Faced with Dr. Goad's repeated unprofessional incidents, the defendants had more than enough reason to terminate Goad from the program, separate and apart from any speech concerns. Dr. Goad was repeatedly warned about the inappropriateness of his conduct and given the opportunity to conform his conduct. Moreover, Dr. Goad has not denied Dr. Silverman's contemporaneous notes of his conversations with Dr. Goad about his conduct. Those notes reveal a troubled man. In fact, at one point Dr. Silverman recorded that Dr. Goad told him that God was using Dr. Silverman as a "leash" to cause him

_____

282. Plaintiff maintained that the Board's refusal to rehire him based on the exercise of his First Amendment rights in placing the call to the radio station was unconstutional. The district court agreed. <u>Id</u>. at 283.

The district court concluded that plaintiff's phone call to the radio was "`clearly protected by the First Amendment,' and that because it had played a `substantial part' in the decision of the Board not to renew [the plaintiff's] employment, he was entitled to reinstatement with backpay." <u>Id</u>. at 283. The United States Court of Appeals for the Sixth Circuit affirmed.

The Supreme Court reversed. The Court took issue with the district court's causation rule noting that "[a] rule of causation which focuses solely on whether protected conduct played a part,`substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct then he would have occupied had he done nothing." <u>Id</u>. at 285. Rather, the Court stressed that the causation analysis involves two shifting burdens. First, the plaintiff must demonstrate that constitutionally protected conduct played a "substantial part" or was a"motivating factor" in the defendant's decision. <u>Id</u>. at 287. Once plaintiff has satisfied that burden, the burden shifts to the defendant to demonstrate, by a preponderance of the evidence, that "it would have reached the same decision ... even in the absence of the protected conduct." <u>Id</u>.

12

to straighten up. Furthermore, Dr. Goad's psychological assessment questioned whether, in light of Dr. Goad's conduct, he could continue effectively as a psychotherapist.**8**

At best, even assuming that Dr. Goad's speech was a factor in his dismissal, under <u>Mt. Healthy</u> and <u>Huang</u> , Dr. Goad must demonstrate that <u>but for</u> his speech he would not have been terminated. Dr. Goad gave the program more than enough sufficient grounds to warrant his termination, despite his religious views. As the district court pointedly noted "[Goad] was discharged because they came to the conclusion that he was not a proper person to be a psychiatrist. And Lord knows, I don't think there is a reasonable person that would disagree with that ...."**9**

_____

**8** At oral argument, counsel for Dr. Goad made much of Dr. Kontos' statement that the Snowden incident "was the final episode that precipitated the dismissal." Dr. Goad's counsel claims that this statement demonstrates that the Snowden incident, during which Dr. Goad discussed sex and religion, is constitutionally protected and thus, the defendants violated Dr. Goad's First Amendment rights in removing him from the program as a result of the Snowden incident. We disagree. Dr. Kontos' statement reveals no more than the situation we have fully discussed above. After four inappropriate incidents with medical students, Dr. Goad was placed on probation and told to cease engaging in such unprofessional conduct, to which for a period of time Dr. Goad abided. Some time thereafter, however, Dr. Goad again, at Snowden, engaged in unprofessional and inappropriate conduct. Dr. Kontos' statement merely reveals the defendants' position that, taking into consideration the four previous incidents, the Snowden incident was the <u>final</u>, cumulative, inappropriate episode in Dr. Goad's career as a resident, and as a result Dr. Goad was expelled from the program. Contrary to counsel's vigorous argument, Dr. Kontos' statement does not demonstrate that Dr. Goad was terminated as a result of his speech, religious or otherwise at Snowden. The defendants removed Dr. Goad from the residency program due to his unprofessional conduct.

**9** Dr. Goad attempts to place his conversations with the First Amendment rubric because he discussed religion in those conversations. As the district court noted, and our reading of the record also confirms, Goad used "[r]eligion in each instance as a forerunner, so to speak, an invitation for sex. It was always of a personal nature. Not a scintilla of evidence that he was speaking in any manner of matters that were of public concern [exists]."

13

B. Freedom of Religion

Assuming that Dr. Goad's speech is properly characterized as religious, to prevail on a First Amendment religion claim, Dr. Goad must demonstrate that the defendants terminated Dr. Goad from the residency program in retaliation for Dr. Goad's expression of his religious views. See Lowrance v. Coughlin, 862 F.Supp. 1090, 1101 (S.D.N.Y. 1994). Dr. Goad's argument is merely a rehash of his speech argument.

Again, no evidence exists in the record to support Dr. Goad's claim that his religious beliefs were the impetus for his dismissal. Viewing the evidence in a light most favorable to Dr. Goad, no reasonable jury could conclude that Dr. Goad was dismissed based on his religion. To the contrary, the record is replete with Dr. Goad's inappropriate and unprofessional contacts with female medical students and a staff social worker; Dr. Goad's acknowledgment of the inappropriateness of his conduct; and Dr. Goad's repeated engaging in such conduct after being warned of the consequences of his actions.[10]

III.

CONCLUSION

Accordingly, the judgment of the district court is

AFFIRMED.

_____

[10] We also affirm the district court's grant of the defendants' Rule 50 motion with respect to Dr. Goad's state wrongful termination claim which stems largely from the same nucleus of facts and arguments as Dr. Goad's First Amendment claims. Dr. Goad has also challenged the district court's grant of summary judgment in favor of the defendants on Dr. Goad's equal protection and due process claims. In addition, Dr. Goad takes issue with the district court's grant of the defendants' Rule 12(b)(6) motion with respect to Dr. Goad's federal conspiracy claim and his state law claims of breach of contract, defamation, and conspiracy. We also have reviewed Dr. Goad's arguments with respect to the district court's actions and Dr. Goad's accompanying arguments. We are unpersuaded that the district court committed error in ruling as it did. Accordingly, the district court is affirmed on these grounds as well.