UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THOMAS M. PARKMAN,
            *Plaintiff-Appellant,*

v.

UNIVERSITY OF SOUTH CAROLINA;
GEORGE D. TERRY; BOBBY GIST;
JENNIFER R. OTTERVIK; JEFFREY R.
WHITSON,

            *Defendants-Appellees.*

No. 01-1596

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., Chief District Judge.
(CA-99-579-3-17)

Argued: April 3, 2002

Decided: August 6, 2002

Before WILKINS and MICHAEL, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Herbert Wiley Louthian, Jr., LOUTHIAN LAW FIRM,
P.A., Columbia, South Carolina, for Appellant. Kathryn Thomas,
GIGNILLIAT, SAVITZ & BETTIS, L.L.P., Columbia, South Caro-
lina, for Appellees. **ON BRIEF:** Deborah R.J. Shupe, LOUTHIAN
LAW FIRM, P.A., Columbia, South Carolina, for Appellant.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

On January 28, 1999, Thomas Parkman (Parkman), formerly the Head Librarian at the University of South Carolina's Music Library (the Music Library), commenced this action in South Carolina state court against the University of South Carolina (the University), two University officials, and two University employees assigned to the Music Library. The defendants timely removed the action to the United States District Court for the District of South Carolina on the basis of federal question jurisdiction. Among other claims, Parkman's complaint alleged claims for violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and civil conspiracy under South Carolina common law.

Parkman's claims arose in part from disciplinary action taken against him by George Terry (Dean Terry), the University's Vice Provost and Dean of Libraries and Information Systems. The disciplinary action stemmed from gender discrimination allegations asserted against Parkman by Jennifer Ottervik (Ottervik), Parkman's assistant, and sexual harassment allegations asserted by Jeffrey Whitson (Whitson), a graduate student assistant in the Music Library. The discipline imposed upon Parkman followed an investigation by the University's Equal Opportunity Programs Office (the EOP Office), which was then headed by Bobby Gist (EOP Director Gist), which investigation resulted in determinations by EOP Director Gist unfavorable to Parkman.

Parkman brought this action against the University, Dean Terry, EOP Director Gist, Ottervik, and Whitson (collectively the Defendants). The two chief underlying premises of Parkman's complaint were: (1) that Ottervik and Whitson fabricated their allegations

against him for their own professional gain, and (2) that the University, through its officials, denied him a fair opportunity to respond to the allegations. Notably, although the University employed Parkman as a tenured librarian at the time he commenced this action, he voluntarily retired from the University for medical reasons prior to the completion of most of the proceedings in the district court.

This appeal comes to us following the district court's grant of summary judgment in favor of the Defendants with respect to all claims. We will later specify the particular claims which Parkman presses on appeal. With respect to the claims presented on appeal, the judgment of the district court is affirmed.

I.

### A.   *Parkman's Professional and Educational Background*

Parkman began his career at the University in September 1972 as a paraprofessional library assistant in the undergraduate library.[1] Based upon his excellent performance in this position, in 1976 Parkman was promoted to a supervisory position in the Music Library. After Parkman received his library science degree in 1982, he was promoted to the position of Head Music Librarian, a tenure track position. He obtained tenure status in 1988. As a tenured faculty member, Parkman was entitled to certain procedural safeguards designed to protect his tenure status. Parkman's annual performance evaluations for 1988, 1989, and 1990 overall were very positive. In addition to his duties as Head Music Librarian, Parkman also taught music bibliography courses in the University's music school.

### B.   *The 1992 Allegations of Male-on-Male Sexual Harassment*

In late March 1992, a student assistant in the Music Library tendered his resignation on the basis that Parkman had allegedly subjected him to sexual harassment. Parkman adamantly denied the

---

[1]Because this case is on appeal from the grant of the Defendants' motion for summary judgment, we view all facts and reasonable inferences therefrom in the light most favorable to Parkman. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

allegations. Even though the student assistant never filed a formal complaint with the University, the University nonetheless placed a series of written reprimands in Parkman's personnel file regarding the allegations. Following Parkman's appeal of each reprimand and negotiations between Parkman and the University, in June 1992, the University agreed to remove all reprimands from Parkman's personnel file and issue him a warning letter instead. The warning letter acknowledged that an informal complaint of sexual harassment had been lodged against Parkman but made no findings regarding the complaint's validity. The University also agreed to purge from Parkman's personnel file all other documents regarding the informal complaint and the University's investigation of the matter.

## C.    *Ottervik Arrives on the Scene*

In January 1995, the University hired Ottervik as Parkman's assistant. The University hired Ottervik despite Parkman's prediction that he and Ottervik would not work well together. Parkman's prediction turned out to be accurate, because soon after Ottervik started work, personality differences developed between Ottervik and Parkman, as well as drastic differences between their opinions regarding the operation of the Music Library.

From February to July 1995, Ottervik kept notes about events in the Music Library involving Parkman. In June 1995, Ottervik wrote a memorandum to Parkman's immediate supervisor, Alan Stokes (Stokes), regarding her work-related problems with Parkman, and outlining her proposals for a division of labor between them. Neither of these documents referenced sexual harassment.

Between June and August 1995, Ottervik learned about the 1992 sexual harassment allegations against Parkman.[2] Thereafter, some of the student assistants in the Music Library improperly used the Music

---

[2]Notably, Dean Terry admitted that even though the University agreed to remove all records, except the warning letter, from its files regarding the 1992 allegations, the two University officials who conducted the investigation of the allegations kept copies of the documents in their "personal" files in the event the alleged victim filed a lawsuit against the University.

Library's computers to access internet websites containing pornography. Ottervik and Parkman vehemently disagreed about how to prevent such improper use in the future.

### D.  *Ottervik's October 1995 EOP Charging Document*

On October 27, 1995, Ottervik filed a charging document against Parkman with the University's EOP Office, alleging: (1) that Parkman had failed to take any remedial action regarding the improper use of the Music Library's computers to electronically access pornography; (2) Parkman had called her "stupid" and a "power hungry bitch"; (3) Parkman had treated her less favorably than her male coworkers; and (4) Parkman had made numerous sexual advances toward male students and student assistants in the Music Library. (J.A. 425). The charging document did not contain any names, dates, or other specifics as to either Parkman's alleged discriminatory treatment of Ottervik or his alleged sexual advances toward male students and student assistants. Nonetheless, the charging document contained a list of six witnesses: Cathy Hewitt, Jeff Whitson, Maureen Albright, Debby Dyck, Stephanie Dillard, and Anthony Marotta.

Parkman received the charging document (with the witness list deleted) on October 31, 1995. The charging document was accompanied by a cover letter from EOP Director Gist specifically instructing Parkman not to discuss the charging document with any member of the faculty, staff, or student body, which discussions he declared may be considered as retaliation that would adversely impact the outcome of his office's investigation.

By letter dated November 8, 1995, EOP Director Gist requested that Parkman formally respond to the charging document filed by Ottervik, including identifying any witnesses that he believed would testify in his favor. As of this date, the University still had not provided Parkman with any specifics regarding the allegations against him, the names of any witnesses to his alleged misconduct, or the substance of any witness statements.

### E.  *Whitson's November 1995 EOP Charging Document*

Also on November 8, 1995, Whitson filed a charging document against Parkman in which he contended that from January through

October 1995 Parkman had physically touched him against his will, made sexually suggestive comments to him, and referred to Ottervik and another employee in the Music Library as "power hungry bitches" in his presence. (J.A. 428). At the time Whitson filed his charging document, he worked in the Music Library. Specifically, he was a graduate student assistant to the music cataloger, who happened to be a friend of Ottervik.

On November 9, 1995, Parkman received the charging document filed by Whitson. Again, the University did not provide Parkman with the names of any witnesses to his alleged misconduct or the substance of any witness statements. The University again instructed Parkman not to contact faculty, staff, or students regarding the matter.

### F.   *Parkman Files Written Response to Ottervik's October 1995 EOP Charging Document*

Parkman filed a written response to Ottervik's charging document in which he explained his side of the internet incident and emphatically denied that he ever engaged in unprofessional conduct or made sexual advances toward male students or student assistants. Parkman also requested the names, addresses, and telephone numbers of all witnesses against him, copies of any witness statements, and all other information collected by the University regarding the matter.

### G.   *Parkman Temporarily Reassigned/Ottervik Promoted*

On November 10, 1995, Dean Terry temporarily reassigned Parkman, without a reduction in his pay or benefits, to a special project related to, but outside, the Music Library (the Special Projects Librarian position). The project was to continue until Ottervik and Whitson's allegations were "thoroughly investigated . . . and some resolution of th[e] matter [wa]s accomplished." (J.A. 277). Dean Terry specifically directed Parkman "not to communicate with any full-time or student employees of the Music Library until th[e] investigation [wa]s completed." (J.A. 277, 659).

Upon Parkman's reassignment from the Music Library, Ottervik assumed his duties, and became the *de facto* Head Music Librarian.

Within a few months of assuming this position, Ottervik fired the technical assistant who had worked for Parkman, and promoted Whitson to the position. In January 1997, the University officially promoted Ottervik to the position of Head Music Librarian.

### H.  *Parkman Files Written Response to Whitson's November 1995 EOP Charging Document*

Parkman responded in writing to Whitson's charging document on November 10, 1995. Again, Parkman emphatically denied all allegations of improper conduct. Parkman also requested a list of witnesses, copies of witness statements, and all other investigative material regarding Whitson's allegations.

By letter dated November 15, 1995, EOP Director Gist advised Parkman that he had five days from receipt of the letter to provide "the names, addresses and phone numbers of any persons [he] would like for the EOP Office to interview on [his] behalf . . . ." (J.A. 280). While demanding information from Parkman, however, EOP Director Gist still provided no information regarding the identity of any witnesses against Parkman, or the substance of their statements.

### I.  *Farley Resigns In Protest of Ottervik and Whitson's Allegations Against Parkman*

On November 21, 1995, John Farley, the night manager of the Music Library, resigned his position in protest of Ottervik and Whitson's allegations against Parkman. In his letter of resignation, Farley stated that he had worked for Parkman for two and one-half years and had never observed any conduct by Parkman that resembled sexual harassment. He characterized Ottervik and Whitson's allegations as unfounded, unethical, and motivated by personal malice.

### J.  *EOP Letter Determinations*

By letter dated December 14, 1995, EOP Director Gist informed Parkman that his office's investigation was complete, but that Parkman could still present any documentation or witness statements to support his position. EOP Director Gist proposed that Parkman accept

a permanent reassignment without supervisory authority, attend a sexual harassment training program, and receive a formal letter of reprimand. By letter dated December 19, 1995, Parkman, through his attorney, reasserted his innocence and rejected EOP Director Gist's proposal.

On January 26, 1996, Parkman received the EOP Office's formal "Letter Determinations" with respect to both Ottervik and Whitson's charging documents. These Letter Determinations stated that Parkman had violated the University's sexual harassment policy. In support, they generally cited "the supporting testimony of a multitude of witnesses," but specifically listed no witnesses by name. (J.A. 319, 326). The Letter Determinations also cited the 1992 allegations against Parkman, noting that those allegations were "strikingly similar" to Ottervik and Whitson's allegations. (J.A. 320, 327).

Neither Letter Determination complied with the University's sexual harassment policy nor the EOP Office's investigation procedures. Specifically, they did not provide any details of Parkman's alleged misconduct, include the names of witnesses interviewed or summaries of their statements, nor provide a chronology of the investigation. Rather, the Letter Determinations essentially stated as established fact the same vague allegations contained in Ottervik and Whitson's charging documents.

Under the University's sexual harassment policy, the Letter Determinations were merely recommendations to Dean Terry, who could order further investigation, invoke sanctions, or determine independently that no sanctions were warranted. The policy specifically left in full force and effect all grievance procedures available to Parkman pursuant to other University policies and applicable law.

The EOP Office procedures provided for a Presidential Review of the Letter Determinations, which consisted of review by a three-member panel appointed by the University President. During such a review, the EOP Office was merely required to "present the rationale for its recommendations findings [sic]." (J.A. 306). While the charged party could be present during that presentation, questioning of witnesses would be at the discretion of the review panel, and conducted solely by members of the panel. Further, even though the review

panel could request additional information from the EOP Office, nothing in the review process afforded Parkman access to that information prior to appearing before the panel.

Under the University's policies, however, Parkman retained his right under the Faculty Manual to use the faculty grievance procedures in the event he was disciplined for misconduct. Those procedures provided for review by the Faculty Grievance Committee, which could conduct a hearing and specifically address due process issues.

### K. *Dean Terry Reprimands and Permanently Reassigns Parkman*

The Letter Determinations were submitted to Dean Terry for review and decision regarding appropriate action. On February 14, 1996, Dean Terry issued a written reprimand to Parkman, finding that Parkman had violated the University's sexual harassment policy, which Dean Terry "deemed to be misconduct related directly and substantially to [Parkman's] fitness as a faculty member." (J.A. 330). The reprimand further stated that "[a]ny future violations of this nature will be considered as an additional incident of misconduct related directly and substantially to [his] fitness as a faculty member and will result in a recommendation that tenure revocation proceedings be initiated." *Id.* Dean Terry also required that Parkman attend sexual harassment prevention training and permanently reassigned him to the Special Projects Librarian position he had assumed in November 1995. From this point forward, we will refer to Dean Terry's response to the Letter Determinations as the February 1996 Reprimand/Reassignment.

### L. *Parkman Formally Appeals Dean Terry's February 1996 Reprimand/Reassignment Through the Faculty Grievance Procedure*

On February 28, 1996, Parkman formally requested, pursuant to the University's Faculty Manual, that Dean Terry withdraw the February 1996 Reprimand/Reassignment, based in part on the denial of his procedural due process rights. By letter dated March 6, 1996, Dean Terry denied the request. Parkman then appealed the February 1996 Reprimand/Reassignment via the faculty grievance procedures set forth in

the University's Faculty Manual through the level of University Provost and University President. Notably, in Parkman's respective letters to Vice President for Academic Affairs and Provost Winona Vernberg and President John Palms requesting review of the February 1996 Reprimand/Reassignment, Parkman did not seek review pursuant to the University's sexual harassment policy nor EOP Office procedures.

Following the University Provost and the University President's denials of his respective appeals, Parkman appealed to the Faculty Grievance Committee. Appearing before the Faculty Grievance Committee on October 9, 1996, Parkman testified on his behalf, presented written statements from twenty-seven witnesses, and live testimony from two witnesses, including Farley. Dean Terry attended the meeting, heard Parkman's case, and testified himself.

### M.  *Decision of the Faculty Grievance Committee*

Based upon the EOP Office's documents, as well as the testimony and statements presented at the meeting, the Faculty Grievance Committee concluded that the EOP Office violated Parkman's procedural due process rights by refusing to provide him with the names and statements of the witnesses against him. The Faculty Grievance Committee further concluded that the EOP Office had improperly considered the 1992 allegation of sexual harassment, which Dean Terry confirmed had been "resolved in [Parkman's] favor." (J.A. 353).

The Faculty Grievance Committee referred the case to the University's general counsel, with instructions to mediate the matter with Parkman's attorney. The Faculty Grievance Committee further ordered that if mediation proved unsuccessful, the whole case should be remanded to the EOP Office for reinvestigation in accordance with proper procedures.

### N.  *Attempted Mediation*

Between November 19, 1996, and January 31, 1997, Parkman's attorney attempted to mediate with the University, but with no success. On January 31, 1997, the University's general counsel refused

to reconsider Parkman's reassignment, but offered to substitute a different written reprimand in Parkman's file, which was essentially the same as the original reprimand.

### O.   *Action of the Board of Trustees' Academic Affairs Committee*

Pursuant to the faculty grievance procedures, Parkman pursued the matter to the University's Board of Trustees' Academic Affairs Committee. By letter dated June 12, 1997, the Committee's Chairman reiterated the Faculty Grievance Committee's directives. If mediation proved unsuccessful, the matter was to be "remanded to the EOP Office for investigation in accordance with the appropriate University policy and procedure," which would "preserve [Parkman's] procedural due process rights as outlined in the *Faculty Manual*." (J.A. 367-368).

### P.   *More Mediation Attempts*

After further mediation attempts failed, Parkman filed a charging document with the EOP Office alleging that Ottervik had violated the University's sexual harassment policy and engaged in abuse of process. In support, Parkman submitted a detailed, sworn statement from Farley, dated June 18, 1997, indicating that Ottervik had made numerous disparaging remarks about Parkman in Farley's presence, including calling Parkman "a faggot, a bastard and a son of a bitch." (J.A. 380). EOP Director Gist refused to investigate Parkman's allegations on the ground that Parkman's charging document did not "meet the standards for the acceptance of a complaint of sexual harassment or abuse of the Sexual Harassment Policy," (J.A. 396), and therefore, the EOP Office lacked jurisdiction. To date, Parkman's appeals of this decision to the University Provost and Board of Trustees remain unanswered.

### Q.   *More Activities of the EOP Office*

After Parkman refused the University's mediation offer, EOP Director Gist requested a meeting with the Faculty Grievance Committee "to clarify what he need[ed] to do differently in an upcoming re-investigation to avert subsequent re-investigation activities." (J.A.

411). On February 27, 1998, over one year after expressly directing the University to afford Parkman his procedural due process rights, the Faculty Grievance Committee held another meeting regarding Parkman's case. On March 25, 1998, the Committee again found that the University had denied Parkman his procedural due process rights by refusing to provide him with specific details of the charges against him and the names and statements of witnesses against him. The Committee also specifically determined that such information should be given to Parkman during the reinvestigation.

On April 16, 1998, over two years after concluding its initial investigation of Ottervik and Whitson's charging documents, the EOP Office sent Parkman a list of witness names. The list did not include the addresses or telephone numbers of any witnesses, nor the substance of any witness statements. Parkman then sent the University a list of thirty-three witnesses on his behalf, most of whom had already submitted written statements that were provided to the University in October 1996, and he again requested any witness statements or interview reports from the EOP Office's investigation.

By letter dated May 17, 1998, the EOP Office indicated that it could find only eight of Parkman's witnesses in the University's 1998 directories. Since the other witnesses were not in the University's 1998 listings, the EOP Office expressed concern that Parkman's witnesses did not have first-hand knowledge regarding the 1995 allegations against Parkman, and it was purportedly "very hesitant to go and seek out these people . . . and educate them as to the particulars of the complaints." (J.A. 435).

### R.  *The Present Lawsuit*

In October 1998, Parkman, by letter, notified the University's Board of Trustees' Academic Affairs Committee of his belief that the EOP Office was still failing to act as directed by the Academic Affairs Committee and the Faculty Grievance Committee. Without receiving a response to his letter, Parkman commenced the present action in South Carolina state court on January 28, 1999. The Defendants removed the action to federal court on the basis of federal question jurisdiction. 28 U.S.C. § 1331. The complaint alleged: (1) a breach of employment contract claim against the University under

South Carolina common law; (2) a conspiracy claim against the Defendants under South Carolina common law; (3) an invasion of privacy claim against the Defendants under South Carolina common law; (4) violation of the Due Process Clause brought under 42 U.S.C. § 1983 against the Defendants; (5) violation of the Equal Protection Clause brought under § 1983 against the Defendants; (6) a statutory civil conspiracy claim brought under § 1985 against the Defendants; (7) an intentional infliction of emotional distress claim against the Defendants under South Carolina common law; and (8) a claim for injunctive relief against the University, requesting that the University be ordered to require its policies and procedures to be written and enforced so as to afford due process and equal protection rights to tenured faculty members and others who are accused of sexual harassment. As previously stated, Parkman voluntarily retired from the University for medical reasons prior to the completion of most proceedings in the district court.

Following the completion of discovery, the Defendants moved for summary judgment with respect to all claims. The district court granted the Defendants' motion *in toto*. This appeal followed. On appeal, Parkman challenges the district court's grant of summary judgment in favor of the Defendants with respect to all claims except his claim against the Defendants under the Equal Protection Clause, his claim against the University and Dean Terry for intentional infliction of emotional distress, and his claim against Dean Terry for invasion of privacy.

## II.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "We review a grant of summary judgment *de novo*, applying the same standard as the district court." *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 874 (4th Cir. 1992). In so doing, we view all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587-88.

### III.

Parkman first contends the district court erred in granting summary judgment in favor of the Defendants with respect to his claim alleging the Defendants violated his procedural due process rights as guaranteed by the Due Process Clause of the Fourteenth Amendment. Parkman's contention is without merit.

The Due Process Clause of the Fourteenth Amendment provides that: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Boiled down to the essentials, Parkman's procedural due process claim alleges that his reprimand and reassignment to the Special Projects Librarian position, without being afforded details of the allegations against him, the ability to contact adverse witnesses, and a hearing at which he could effectively cross examine his accusers and adverse witnesses, deprived him of his property interest in the position of Head Music Librarian and his liberty interests in his personal and professional reputation and future employment opportunities.

In rejecting Parkman's procedural due process claim, the district court concluded that although the evidence presented a jury issue as to whether Parkman was afforded procedural due process in connection with the allegations in Ottervik and Whitson's charging documents, Parkman could not show that he was deprived of a protected property or liberty interest given that his reassignment did not include tenure revocation nor a reduction in his pay. We agree with the district court.

### A.    *Property Right*

The district court properly determined that Parkman has not established that he was deprived of a property interest protected by the Due Process Clause. Our relevant circuit precedent is not favorable to Parkman. In *Huang v. Board of Governors*, 902 F.2d 1134 (4th Cir. 1990), we rejected a procedural due process challenge by a full tenured professor to an interdepartmental transfer on the basis that the transfer of a tenured professor from one department to another, without loss of rank or pay, does not implicate any property interest protected by the Due Process Clause. *Id.* at 1142. We recognized that our

position was consistent with that of the Fifth and Sixth Circuits, which had already held that "certain intra-departmental demotions do not implicate property interests subject to procedural due process protection." *Id.* (citing *Garvie v. Jackson*, 845 F.2d 647, 651 (6th Cir. 1988) (demotion from department chairman to professor not a denial of a protected property interest); *Kelleher v. Flaw*, 761 F.2d 1079, 1087 (5th Cir. 1985) (reduction of graduate student's teaching duties is not denial of a protected property interest)).

Moreover, in a case subsequent to *Huang*, we characterized our holding in *Huang* as follows: "The constitutionally protected property interest in employment does not extend to the right to possess and retain a particular job or to perform particular services." *Fields v. Durham*, 909 F.2d 94, 98 (4th Cir. 1990); *contra Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 900-01 (8th Cir. 1994) (recognizing that industrial arts teacher with a nineteen-year clean record at the same high school had a property interest protected by the Due Process Clause in his particular assignment to that same high school). In *Fields*, we went on to explain that "the property interest is more generally in continued employment, and no deprivation exists so long as the employee receives payment of the full compensation due under the contract." *Id.* (internal quotation marks omitted).

Here, Parkman's reassignment from the Head Music Librarian position to the Special Projects Librarian position left his tenure status and rate of compensation completely in tact. Furthermore, while it is true that his new position did not entail supervisory responsibilities as did his former position, our circuit precedent is quite clear that a public employee such as Parkman does not have a property right protected by the Due Process Clause to perform certain services. *Fields*, 909 F.2d at 98; *Huang*, 902 F.2d at 1141-42. Under these circumstances, application of our circuit precedent establishes that Parkman's procedural due process claim based upon his position as Head Music Librarian fails. Accordingly, we affirm the district court's grant of summary judgment in favor of the Defendants in this regard.

## B.  *Liberty Interest*

Parkman contends the district court erred by granting summary judgment in favor of the Defendants with respect to his procedural

due process claim alleging deprivation of his asserted liberty interests in his personal and professional reputation and future employment opportunities. As the district court concluded, the claim is foreclosed by our decision in *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990).

In *Johnson*, the plaintiff, a public employee who had been demoted and transferred for alleged misconduct on the job, alleged that his employer's public announcement of the reasons for his demotion without notice and an opportunity to be heard deprived him of his liberty interests in his reputation and future career opportunities in violation of the Due Process Clause. *Id.* at 998. Following a bench trial, the district court entered judgment in favor of the plaintiff on the claim. *Id.*

On appeal, we reversed on the ground that no protectable liberty interest was implicated by the public announcement of the reasons for the plaintiff's demotion. *Id.* at 1000. In this regard, we held that "for a liberty interest to have been implicated, some damage to [the plaintiff's] employment status must have resulted from publication of the reasons for his demotion." *Id.* at 999. Because the plaintiff remained employed by his public employer, we concluded that he suffered no damage to his employment status and could not be heard to complain that he had been made unemployable as the result of the publication. *Id.* We also concluded that any harm to the plaintiff's chances for career advancement with his public employer did not result from the publication of the reasons for his demotion, but from the reasons for the demotion itself. *Id.* at 999-1000.

In the present case, like the plaintiff in *Johnson*, Parkman remained employed by his public employer after the public announcement of the reasons for the February 1996 Reprimand/Reassignment. Accordingly, he suffered no damage to his employment status and cannot be heard to complain that he has been made unemployable. Furthermore, any harm that came to Parkman's chances for career advancement with the University did not result from the publication of the reasons for the February 1996 Reprimand/Reassignment, but from the reasons for such action. In short, Parkman cannot establish that he has been deprived of a liberty interest protected by the Due Process Clause, and therefore, we affirm the district court's grant of summary judgment

in favor of the Defendants with respect to Parkman's claim alleging the Defendants deprived him of his liberty interests in his personal and professional reputation and future career opportunities.

IV.

Parkman next contends the district court erred in granting summary judgment in favor of the University with respect to his breach of employment contract claim. We affirm.

With respect to this claim, the district court first concluded that a jury could reasonably find from the evidence that the University materially breached numerous aspects of Parkman's employment contract (as reflected in the University's policies and procedures). Specifically, in this regard, the district court stated:

> A jury could certainly conclude that various actions and inactions by the EOP were material breaches of the terms of the contracts because they resulted in fundamental unfairness in the EOP investigation. Specifically, a jury could reasonably conclude that: (1) plaintiff never had adequate notice of the precise charges against which he was required to defend; (2) no effort was made to limit the charges considered to the strict 180 day pre-complaint time frame imposed by the relevant procedures (and corresponding law); (3) plaintiff was hampered in his defense both by being denied notice of the complainants' witnesses and being precluded from speaking with any student or employee who might be able to testify in his favor; (4) no similar limitation was imposed on the complainants; (5) the EOP assumed an impermissible adversarial role rather than seeking, impartially, to investigate the matter; (6) the EOP considered impermissible information (most particularly the 1992 allegations) and failed to consider proper information, or at least to document properly what information was considered (no chronology of the investigation or summary of witness statements was prepared or included); and (7) the EOP compounded the failings in their process by failing to properly document their investigation and share that information with plaintiff for his use in the appeal process.

(J.A. 672-73) (internal footnote omitted). Despite the district court's well supported determination that material breaches of the terms of the documents that constituted Parkman's employment contract were breached by the University, the district court concluded that Parkman could not prevail on his breach of employment contract claim because he had no legally compensable contractual damages. In this regard, the district court reasoned:

> As plaintiff received a remand, and that remand remained open at the time this action was filed, there is no finding against plaintiff by the EOP (the original finding having been mooted by the remand itself). Thus, while the process had its significant failings, the court finds that there are no legally compensable contractual damages.

(J.A. 675). In other words, the district court concluded that summary judgment was warranted on Parkman's breach of employment contract claim because his case was remanded for reinvestigation, which reinvestigation was still pending when Parkman commenced the present action.

On appeal, Parkman takes issue with the district court's reasoning on the basis that the district court ignored evidence that the University never made a good faith effort to comply with the Faculty Grievance Committee's instructions, either through mediation or reinvestigation. Parkman's argument is without merit. Critically, the argument ignores the undisputed fact that the Board of Trustees' Academic Affairs Committee also ordered the EOP Office to reinvestigate the complaints against Parkman. In other words, the University itself attempted to take corrective action to ensure that Parkman received a fair procedural process before the EOP Office. Relatedly, we hold that the district court was eminently correct that Parkman has shown no compensable damages as a result of the EOP Office's botched handling of Ottervik and Whitson's charging documents. The matter being on remand, no determination adverse to Parkman was still in existence at the time that Parkman filed the present action. In sum, we hold the district court properly granted summary judgment in favor of

the University with respect to Parkman's breach of employment contract claim.[3]

## V.

Next, we address Parkman's challenge to the district court's grant of summary judgment in favor of Ottervik and Whitson with respect to his claims for intentional infliction of emotional distress and invasion of privacy. The district court granted summary judgment in favor of Ottervik and Whitson with respect to these claims on the ground that the claims were barred by the applicable statute of limitations. Parkman vigorously argues that summary judgment was inappropriate because the evidence raises genuine issues of material fact regarding when his claims accrued against Ottervik and Whitson for intentional infliction of emotional distress and invasion of privacy.

It is undisputed that the three-year statute of limitations provided under South Carolina law, S.C. Code Ann. § 15-3-530 (Law. Co-op. Supp. 2001), governs these claims. Therefore, summary judgment with respect to both claims was proper if both accrued before January 28, 1996.

On appeal, Parkman contends that his claims are not based on the allegations contained in the charging documents that Ottervik and Whitson filed with the EOP Office. Rather, he asserts that his claims are based upon allegations that Ottervik and Whitson conspired with the University to build a case against him, prevent him from having any meaningful opportunity to respond to the sexual harassment charges, invade his privacy by publicizing those charges, and ultimately ruin his professional standing. According to Parkman, his claims against Ottervik and Whitson did not accrue until February 14, 1996, when Dean Terry issued him the February 1996 Reprimand/Reassignment.

---

[3]While we do affirm the district court's grant of summary judgment in favor of the University with respect to Parkman's breach of employment contract claim, we desire to express our strong disdain for the poor manner in which the EOP Office conducted its investigation of Ottervik and Whitson's charging documents. We certainly expect better from our public officials.

We conclude that the district court correctly granted summary judgment in favor of Ottervik and Whitson with respect to Parkman's claims for invasion of privacy and intentional infliction of emotional distress on the basis that those claims are barred by the applicable statute of limitations. As the district court insightfully stated:

> Parkman conceded in his deposition that Ottervik and Whitson had not done anything to harm him after January 26, 1996. They had made their charges against him, which Parkman considered slanderous at the time he received them, and he suffered the resulting humiliation of being temporarily reassigned by November 1995. As such, he knew he had a cause of action against Ottervik and Whitson in 1995, more than three years before he commenced this action.

(J.A. 670). We affirm on the reasoning of the district court.[4]

## VI.

We next address Parkman's claims for common law civil conspiracy and statutory civil conspiracy under § 1985 against the Defendants on the merits.

---

[4]The district court also disposed of Parkman's claims against Ottervik and Whitson for violation of the Due Process Clause of the Fourteenth Amendment, common law civil conspiracy and statutory civil conspiracy under § 1985 on the ground that the claims were barred by the applicable three-year statute of limitations. We have already affirmed the district court's grant of summary judgment in favor of Ottervik and Whitson with respect to Parkman's claim alleging violation of the Due Process Clause of the Fourteenth Amendment, Part III *supra*. Accordingly, we need not and do not address that claim against Ottervik and Whitson on statute of limitations grounds. Furthermore, we need not and do not address on statute of limitations grounds whether the district court properly granted summary judgment in favor of Ottervik and Whitson with respect to Parkman's claims for common law civil conspiracy and statutory civil conspiracy under § 1985. As we will explain in the immediately following part of this opinion, Part VI *infra*, Parkman's claims against Ottervik and Whitson for common law civil conspiracy and statutory civil conspiracy under § 1985 clearly fail on the merits.

A. *Common Law Civil Conspiracy*

Under South Carolina common law, a claim for civil conspiracy requires three elements: (1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; (3) which causes the plaintiff special damages. *Lawson v. S.C. Dep't of Corrections*, 532 S.E.2d 259, 261 (S.C. 2000). This third element required Parkman to allege and prove damages that occurred as a result of the alleged conspiracy itself, in addition to any damages alleged as a result of any other claims. *Vaught v. Waites*, 387 S.E.2d 91, 95 (S.C. Ct. App. 1989). That is, the damages allegedly resulting from the conspiracy must not overlap with or be subsumed by the damages allegedly resulting from the other claims.

Fatal to Parkman's claim for common law civil conspiracy against the Defendants is the fact that he has not alleged nor proven any special damages in connection with the claim as required under South Carolina law. Rather, he merely realleges the same damages that he had already alleged in association with all of his other claims. On this basis, we affirm the district court's grant of summary judgment in favor of the Defendants with respect to his claim against the Defendants for common law civil conspiracy.[5]

B. *Statutory Civil Conspiracy under § 1985*

Simply stated, Parkman's claim for statutory civil conspiracy under § 1985 alleged that the Defendants conspired to violate his Fourteenth Amendment right to due process of law before he could be deprived of his alleged property interest in his position as Head Music Librarian. As we previously explained in Part III, *supra*, Parkman does not have a constitutionally protected property interest in his position as Head Music Librarian. As such, his statutory civil conspiracy claim

---

[5]The district court granted summary judgment in favor of the University, Dean Terry, and EOP Director Gist with respect to Parkman's claim for common law civil conspiracy on the ground that the intracorporate conspiracy doctrine barred the claim. Because we affirm the disposal of the claim against these defendants on a different ground, we need not and do not address the propriety of the district court's application of the intracorporate conspiracy doctrine.

under § 1985 cannot be sustained. On this basis, we affirm the district court's grant of summary judgment in favor of the Defendants with respect to Parkman's claim for statutory civil conspiracy under § 1985.

VII.

The next issue on appeal is whether the district court erred in granting summary judgment in favor of EOP Director Gist with respect to Parkman's claim for intentional infliction of emotional distress. The issue is easily resolved in favor of EOP Director Gist.

Parkman's claim for intentional infliction of emotional distress against EOP Director Gist requires him to establish a number of elements, including that EOP Director Gist's conduct was so extreme and outrageous that it exceeded all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community. *Fleming v. Rose*, 526 S.E.2d 732, 739 (S.C. Ct. App. 2001). Proof of this element generally requires proof of hostile or abusive encounters or coercive or oppressive abuse by the defendant. *Id.* at 739-40. For example, in *McSwain v. Shei*, 402 S.E.2d 890 (S.C. 1991), the South Carolina Supreme Court held that a jury could find outrageous and intolerable the conduct of an employer who forced the plaintiff employee to perform exercises in public that exposed her incontinence problem to others. *Id.* at 892.

The only conduct of EOP Director Gist alleged by Parkman to have occurred within the applicable three-year statute of limitations period (January 28, 1996 to January 28, 1999) was EOP Director Gist's failure to follow through with a prompt reinvestigation of Ottervik and Whitson's charging documents as ordered by the Faculty Grievance Committee and the Board of Trustees' Academic Affairs Committee. Such conduct falls far short of conduct that exceeds all bounds of decency. Moreover, while EOP Director Gist's heel dragging with respect to the ordered reinvestigation was extremely unprofessional, it cannot be regarded as utterly atrocious or intolerable in a civilized society. In sum, we affirm the district court's grant of summary judg-

ment in favor of EOP Director Gist with respect to Parkman's claim for intentional infliction of emotional distress.[6]

## VIII.

We now consider whether the district court erred in granting summary judgment in favor of the University and EOP Director Gist with respect to Parkman's claim for invasion of privacy. We hold the district court did not so err and affirm on the reasoning of the district court.

Parkman bases his invasion of privacy claim against the University and EOP Director Gist upon his allegation that they publicized his private affairs without any legitimate public concern. *Rycroft v. Gaddy*, 314 S.E.2d 39, 42 (S.C. Ct. App. 1984) (stating that South Carolina recognizes common law cause of action for invasion of privacy based upon the publicizing of private affairs with no legitimate public concern). On this topic, the district court stated:

> Parkman testified at his deposition that Bobby Gist invaded his privacy by "accept[ing] without any questions or skepticism a series of fraudulent accusations about me, about my life, about my lifestyle, about the way I behave." [Parkman Depo. pp. 186-87]. These allegations do not support an invasion of privacy claim. The only allegation which might go to the issue of publication of private affairs by Gist is the EOP's apparent decision, as evidenced by the EOP report, to contact witnesses not listed by the parties. No record has, however, been offered to support a claim that plaintiff's injuries flow from this contact. Thus, Bobby Gist is entitled to summary judgment on this claim.

*            *            *

---

[6]The district court disposed of this claim against EOP Director Gist on the ground that the South Carolina Workers' Compensation Law preempted it. Because we affirm the district court's grant of summary judgment in favor of EOP Director Gist on a different ground, we express no opinion on the correctness of the ground relied upon by the district court.

The University is also entitled to summary judgment on the claim of invasion of privacy. Parkman vaguely alleges only that the University "aided and abetted this whole process." [Parkman Depo. p. 181]. The actions of the University after the EOP issued its initial Letter of Determination have been limited to receiving and responding to Parkman's complaints and appeals. No evidence has been offered of invasion of privacy by the University or its employees acting on behalf of the University within the relevant period.

(J.A. 678) (alteration and brackets in original).

We discern no flaws in the district court's analysis. Indeed, Parkman fails to point us to even a single citation in the joint appendix in support of his claim for invasion of privacy against the University and EOP Director Gist. We wholeheartedly agree with the overall sentiment of the district court that Parkman based the claim solely upon speculation. We affirm on the reasoning of the district court.

IX.

Lastly, we consider whether the district court erred in granting summary judgment in favor of the University with respect to Parkman's claim for injunctive relief. In his claim for injunctive relief, Parkman sought an injunction that ordered the University to require that its policies and procedures regarding gender discrimination and sexual harassment be written and enforced so as to afford due process and equal protection to tenured faculty members and others who have been accused of engaging in such misconduct.

Given the fact that by the time the district court ruled on the Defendants' summary judgment motion, Parkman had voluntarily retired from the University, the district court disposed of Parkman's claim for injunctive relief on the ground of mootness. On appeal, Parkman argues that his claim for injunctive relief is not moot because the record fails to contain any evidence suggesting that he will not seek reemployment with the University or future employment elsewhere. He also argues that his claim is not moot because the fact that the University sought to remove all documentation from his personnel

record as part of its mediation efforts suggests that his personnel file still contains the 1996 Reprimand/Reassignment.

We hold the district court did not err in granting summary judgment in favor of the University with respect to Parkman's claim for injunctive relief. As a plaintiff seeking injunctive relief, Parkman had the stiff burden of showing that he was currently under imminent threat of suffering further harm in the absence of the injunctive relief that he sought. *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) (stating that an injunction "will not be granted against something merely feared as liable to occur at some indefinite time in the future"); *Belk v. Charlotte-Mecklenburg Bd. of Ed.*, 269 F.3d 305, 347 (4th Cir. 2001) ("Before a court grants a permanent injunction, the court must first find necessity—a danger of future violations."); *Bloodgood v. Garraghty*, 783 F.2d 470, 475 (4th Cir. 1986) ("An injunction is a drastic remedy and will not issue unless there is an imminent threat of illegal action."). Parkman offers no evidence in this regard. The fact that he may seek reemployment with the University or employment elsewhere in the future is simply too speculative to meet the understandably stiff burden for obtaining permanent injunctive relief.

## X.

As set forth above, we affirm the district court's grant of summary judgment in favor of the Defendants with respect to all claims pressed by Parkman on appeal.

*AFFIRMED*